240 F.3d 739 (9th Cir. 2001)
 GERLING GLOBAL REINSURANCE CORP.OF AMERICA; GERLING GLOBAL REINSURANCE CORP. -U.S. BRANCH; GERLING GLOBAL LIFE REINSURANCE COMPANY; GERLING GLOBAL LIFE INSURANCE COMPANY; GERLING AMERICA INSURANCE COMPANY; and CONSTITUTION INSURANCE CORP., Plaintiffs-Appellees,
v.
HARRY W. LOW,* in his capacity as the COMMISSIONER OF INSURANCE OF THE STATE OF CALIFORNIA, Defendant-Appellant.
ASSICURAZIONI GENERALI, Plaintiff-Appellee,
v.
HARRY W. LOW, individually, and in his capacity as the INSURANCE COMMISSIONER for the STATE OF CALIFORNIA, Defendant-Appellant.
WINTERTHUR INTERNATIONAL AMERICA INSURANCE COMPANY; WINTERTHUR INTERNATIONAL AMERICA UNDERWRITERS INSURANCE COMPANY; GENERAL CASUALTY COMPANY OF WISCONSIN; REGENT INSURANCE COMPANY; REPUBLIC INSURANCE
COMPANY; SOUTHERN INSURANCE COMPANY; UNIGARD INDEMNITY COMPANY; UNIGARD INSURANCE COMPANY; and BLUE RIDGE INSURANCE COMPANY, Plaintiffs-Appellees,
v.
HARRY W. LOW, in his capacity as INSURANCE COMMISSIONER for the STATE OF CALIFORNIA, Defendant-Appellant.
AMERICAN INSURANCE ASSOCIATION and AMERICAN RE-INSURANCE COMPANY, Plaintiffs-Appellees,
v.
HARRY W. LOW, in his capacity as INSURANCE COMMISSIONER for the STATE OF CALIFORNIA, Defendant-Appellant.
 No. 00-16163 No. 00-16164 No. 00-16165 No. 00-16182
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted January 9, 2001
Filed February 7, 2001
 
 COUNSEL: Frank Kaplan, Alschuler Grossman Stein & Kahan, LLP, Los Angeles, California, Andrew W. Stroud, Mennemeier, Glassman & Stroud LLP, Sacramento, California, and Michael D. Ramsey, San Deigo, California, for the defendant-appellant.
 Kenneth S. Geller, Mayer, Brown & Platt, Washington, D.C.; Linda Dakin-Grimm and John C. Ashby, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, California; Frederick W. Reif, Wilson, Elser, New York, New York, and Timothy P. Grieve, Stevens & O'Connell LLP, Sacramento, California; and Peter Simshauser, Skadden, Arps, Slate, Meagher & Flom, LLP, Los Angeles, California, for the plaintiffs appellees.
 Daniel L. Siegel, Supervising Deputy Attorney General, State of California, Sacramento, California; Mark B. Stern and Douglas Hallward-Driemeier, Appellate Staff Civil Division, Department of Justice, Washington, D.C.; David A. Lash, Bet Tzedek Legal Services, Los Angeles, California; David O. Bucholz, Department of Justice, Civil Division, Washington, D.C.; and Daniel B. Price, Powell, Goldstein, Frazer & Murphy LLP, Washington, D.C., for the amici curiae.
 Appeals from the United States District Court for the Eastern District of California William B. Shubb, District Judge, Presiding. D.C. No.CV-00-00506-WBS D.C. No. CV-00-00875-WBS D.C. No. CV-00-00779-WBS D.C. No. CV-00-00613-WBS
 Before: Alfred T. Goodwin, Susan P. Graber, and Richard A. Paez, Circuit Judges.
 OPINION
 GRABER, Circuit Judge:
 
 
 1
 Plaintiffs are three insurance companies and one trade organization of insurance companies who do business in California. They sued the California Commissioner of Insurance (Commissioner) seeking declaratory and injunctive relief to bar enforcement of the Holocaust Victim Insurance Relief Act of 1999 (HVIRA), Cal. Ins. Code SS 13800-13807 (1999). The district court issued a preliminary injunction after ruling that Plaintiffs had established a likelihood of irreparable harm and a probability of success on the merits of the questions whether HVIRA violates the Commerce Clause and whether it violates the federal government's "foreign affairs" power. The Commissioner brings this appeal. We leave the preliminary injunction in place, but for reasons different than those expressed by the district court.
 
 FACTUAL AND PROCEDURAL HISTORY
 
 2
 HVIRA requires insurers that do business in California and that sold insurance policies, in effect between 1920 and 1945 (Holocaust-era policies), to persons in Europe to file certain information about those policies with the Commissioner.[1] Cal. Ins. Code S 13804(a). The reporting requirement also applies to insurance companies that do business in California and are "related" to a company that sold Holocaust-era policies, even if the relationship arose after the policies were issued. Id. A "related company" is any "parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer." Id. S 13802(b). HVIRA requires the Commissioner to store the information in a public "Holocaust Era Insurance Registry." Id. S 13803. The Commissioner must "suspend the certificate of authority to conduct insurance business in the state of any insurer that fails to comply" with HVIRA's reporting requirements. Id.S 13806.
 
 
 3
 Plaintiffs filed four separate actions against the Commissioner, in which they sought to enjoin enforcement of HVIRA. The actions were brought by: (1) Gerling Global Reinsurance Corp. of America and its affiliates (collectively, Gerling), who are, according to their complaint,"arguably `affiliated' [with] . . . or `related[to]' " two German insurers that issued Holocaust-era policies; (2) American Insurance Association (AIA), a nonprofit trade association of insurers whose member-insurers are required to report under HVIRA, and American Re-insurance Company, a wholly owned subsidiary of a German corporation "that has investment interests in European insurance companies that do issue insurance policies"; (3) Winterthur International America Insurance Company, its affiliates, and numerous other insurance and underwriting companies (collectively, Winterthur), who are "arguably `related companies' . . . with more than forty insurance companies currently located in Europe"; and (4) Assicurazioni Generali (Generali), an Italian insurance company that issued Holocaust-era policies and currently does business in California. The district court determined that the four cases were "related" within the meaning of Eastern District of California Local Rule 123(a) and assigned the cases to the same judge, but did not consolidate them.
 
 
 4
 Plaintiffs sought declaratory and injunctive relief, claiming that HVIRA violates the Commerce Clause, the Due Process Clause, the Equal Protection Clause, and the foreign affairs power. Gerling also asked the court to review two statutes that were enacted at the same time as HVIRA: (1) California Code of Civil Procedure S 354.5 (1999), which allows California residents to bring claims for the payment of Holocaust-era insurance policies and extends the statute of limitations on such claims until December 31, 2010; and (2) California Insurance Code S 790.15 (1999), which requires the Commissioner to suspend the certificate of authority of any insurer who has failed to pay on valid Holocaust-era policies. The Commissioner filed a motion to dismiss in which he argued that Gerling did not have standing to challenge California Code of Civil Procedure S 354.5 or California Insurance Code S 790.15. The district court granted the motion, ruling that Gerling had not established an imminent threat of prosecution under those statutes. Gerling does not challenge that holding.
 
 
 5
 Plaintiffs all filed motions for a preliminary injunction. The district court granted their motions, holding that "plaintiffs have established a probability of success under the foreign affairs doctrine and the Commerce Clause." The court did not rule on Plaintiffs' other grounds for relief. The district court also held that Plaintiffs had established the likelihood of irreparable injury.
 
 
 6
 The Commissioner timely appealed the district court's orders in all four cases. We have jurisdiction under 28 U.S.C. S 1292(a)(1). Because these cases all involve the same legal issues, we consider them together.
 
 STANDARD OF REVIEW
 
 7
 We review for abuse of discretion the grant of a preliminary injunction. FDIC v. Garner, 125 F.3d 1272, 1276 (9th Cir. 1997). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Roe v. Anderson , 134 F.3d 1400, 1402 (9th Cir. 1998).
 
 DISCUSSION
 
 8
 A. The Standard for Issuing a Preliminary Injunction
 
 
 9
 "To obtain a preliminary injunction, a party must establish either: (1) probable success on the merits and irreparable injury, or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation with the balance of hardships tipping decidedly in its favor." Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998). The two alternatives represent two points on a sliding scale. Roe, 134 F.3d at 1402. The district court held that Plaintiffs' actions fell within the first category. The Commissioner does not dispute the district court's finding of irreparable injury; rather, he questions whether the district court abused its discretion in ruling that Plaintiffs established a probability of success on the merits.
 
 
 10
 The district court's reasoning implies that Plaintiffs demonstrated a probability of success on their claim that HVIRA is unconstitutional on its face. The court did not make individualized findings of irreparable injury, nor did it discuss either constitutional claim in the context of a particular Plaintiff. As presented in this appeal, Plaintiffs' challenges to HVIRA involve issues of law only.
 
 B. The Commerce Clause Claim
 
 11
 As noted, the district court held that Plaintiffs established a probability of success that HVIRA violates the Commerce Clause. We disagree and hold that the district court based its conclusion on an erroneous view of the law.
 
 
 12
 1. The McCarran-Ferguson Act, 15 U.S.C. SS 1011-1014 (1945) (McCarran Act)
 
 
 13
 In United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553 (1944), the Supreme Court held that the "business of insurance" fell within Congress' power to regulate interstate commerce. That holding conflicted with the previous understanding of the relationship between the business of insurance and the CommerceClause; before 1944, the Court had implied that the states could regulate the insurance industry without federal interference. See Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 414-16 (1946) (discussing the history of insurance regulation and the Commerce Clause).
 
 
 14
 The McCarran Act was Congress' response. Id. Title 15, S 1011 of the McCarran Act states:
 
 
 15
 Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 
 
 16
 Section 1012(a) provides that the "business of insurance . . . shall be subject to the laws of the several States which relate to the regulation or taxation of such business." The phrase "business of insurance" refers to "the relationship between the insurance company and the policyholder " and includes "the fixing of rates[,] . . .[t]he selling and advertising of policies, and the licensing of companies and their agents." SEC v. National Sec., Inc., 393 U.S. 453, 460 (1969) (citations omitted).
 
 2. The McCarran Act Applies to HVIRA
 
 17
 Plaintiffs argue, and the district court held, that the McCarran Act does not apply to HVIRA because it is an impermissible "extraterritorial" regulation, as discussed by the Supreme Court in FTC v. Travelers Health Ass'n, 362 U.S. 293 (1960), and by this court in Ace Check Cashing, Inc. v. Aetna Casualty & Surety Co. (In re Insurance Antitrust Litigation), 938F.2d 919 (9th Cir. 1991), aff'd in part, rev'd in part sub nom. Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993). Neither Travelers nor In re Insurance applies to the present dispute, however.
 
 
 18
 Travelers and In re Insurance involved the interpretation of S 1012(b) of the McCarran Act, which instructs courts not to construe any other federal statute as preempting a state insurance regulation unless there is a clear statement from Congress to do so. Section 1012(b) reads in part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance[.]" Section 1012(b) also provides that the Sherman Act, the Clayton Act, and the Federal Trade Commission (FTC) Act do apply to the "business of insurance," but only "to the extent that such business is not regulated by State law."
 
 
 19
 The Supreme Court in Travelers and this court in In re Insurance held that Congress did not intend to shield an insurance company from federal regulation if one state expressly regulated an insurance company's conduct, but the conduct that the federal government sought to regulate occurred in a different state. In Travelers, a Nebraska statute prohibited Nebraska insurance corporations from engaging in unfair trade practices "in any other state." 362 U.S. at 296. A Nebraska insurance corporation argued that the Nebraska statute precluded the FTC, under S 1012(b) of the McCarran Act, from regulating conduct of the insurance corporation that occurred outside Nebraska. The Supreme Court disagreed, concluding that Congress did not intend for the "law of a single State [to take] from the residents of every other State the protection of the" FTC Act. Id. at 298.
 
 
 20
 The Court observed that Congress had delegated its power to regulate insurance because it believed that insurance regulation was a local matter. Id. at 302. The Court reasoned that the insurance company's argument would subvert the McCarran Act; if one state had a fair-trade statute that purported to regulate nationwide, an insurance company located there would be free from the reach of the FTC Act in every other state. The Court's interpretation of 15 U.S.C. S 1012(b) avoided this absurd result.
 
 
 21
 Similarly, in In re Insurance, this court applied Travelers to reject the notion that Congress intended for the antitrust law of a single state to preclude application of the Sherman Act to insurers' conduct that occurred in other states. In re Insurance, 938 F.2d at 928. We noted that "[s]tate insurance schemes do not, and could not, purport to regulate the bulk of international insurance transactions." Id. (citation and internal quotation marks omitted).
 
 
 22
 In neither case did the court evaluate the constitutionality under the Commerce Clause of the state act that attempted to regulate "extraterritorially." Instead, both cases involved statutory interpretation. The courts merely held that, irrespective of the constitutional limits of a state's power to regulate extraterritorially, Congress did not intend for the regulatory scheme of one state to protect the citizens of all other states and thereby eliminate the need for federal regulation.
 
 
 23
 There is a second important distinction between the two cited cases and the present dispute: the difference between HVIRA and the state laws considered in Travelers and In re Insurance. In those cases, the state laws sought to regulate directly the conduct of an insurer in another jurisdiction. By contrast, HVIRA seeks only to obtain information about conduct in another jurisdiction, without affecting directly any of that conduct. For those two reasons, neither Travelers nor In re Insurance answers the question that we face.
 
 
 24
 The district court's holding that the McCarran Act does not apply to HVIRA also rested on its belief that HVIRA must be viewed as a part of California's overall plan to force foreign insurance companies to settle insurance claims with California's residents. The district court cited HVIRA's legislative findings and declarations and held that HVIRA encourages the resolution of claims concerning Holocaust-era policies "through an international process" and thus attempts to "regulate the decision making authority of European insurance companies to pay or not to pay claims on European policies." That reasoning mischaracterizes HVIRA as a matter of law.
 
 
 25
 HVIRA, by its terms, does not regulate "the decision making authority of European insurance companies to pay or not to pay claims on European policies" in any way. HVIRA requires California companies only to provide information about Holocaust-era insurance policies that they (or any of their affiliates) issued.
 
 
 26
 A second and separate statute, California Code of Civil Procedure S 354.5, allows California residents to bring claims for payment of Holocaust-era insurance policies. A third statute, California Insurance Code S 790.15, authorizes the Commissioner to suspend the licenses of insurance companies who have not paid valid Holocaust-era claims. The district court dismissed Gerling's action challenging the validity of those two provisions because Gerling lacked standing. In short, the question of the validity of those two statutes must remain for another day.
 
 
 27
 It is true that, by enacting HVIRA, California's legislature intended to help California residents recover on unpaid poli-cies that were entered into in foreign countries by giving them access to information. It also is likely that California's legislature simply intended to protect its residents from insurance companies that have not paid valid insurance claims.[2] In any event, however, the legislature's stated purpose in enacting a statute is not dispositive of a dormant Commerce Clause challenge. The Commerce Clause seeks to prevent extraterritorial economic "effects," not purposes. See Healy v. Beer Inst., 491 U.S. 324, 336 (1989) ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Extraterritorial regulation "is invalid regardless" of the intent of the enacting legislature.) (emphasis added); Birth Hope Adoption Agency, Inc. v. Arizona Health Care Cost Containment Sys., 218 F.3d 1040, 1044 (9th Cir. 2000) ("The first step in evaluating state regulatory measures under the dormant Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce.") (citations and internal quotation marks omitted).
 
 
 28
 HVIRA's reporting requirements might force a "related" company of a California business to search for information, but that is the extent of HVIRA's "extraterritorial" reach. HVIRA, on its face, does not regulate foreign insurance policies, or control the substantive conduct of a foreign insurer, or otherwise affect "the business of insurance " in any other country.
 
 
 29
 In conclusion, Congress has expressly delegated to the states the power to regulate insurance, free from the constraints of the dormant Commerce Clause. The Supreme Court has noted that the "licensing of companies " is part of the "business of insurance" and is covered by the McCarran Act.[3] National Sec., 393 U.S. at 460. HVIRA is a California insurance regulation of California insurance companies that affects foreign commerce only indirectly. Consequently, the McCarran Act applies and the dormant Commerce Clause does not. See Benjamin, 328 U.S. at 430-31 (noting that Congress, through the McCarran Act, "clearly put the full weight of its power behind existing and future state legislation to sustain it from any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for").
 
 
 30
 3. HVIRA Does Not Impede the Federal Government's Ability to Speak With "One Voice" on a Matter Affecting Foreign Commerce
 
 
 31
 HVIRA touches on foreign commerce because of the indirect effect described above. The question remains whether that fact provides an independent reason to hold that Plaintiffs have established a probability that HVIRA is unconstitutional. The answer is "no."
 
 
 32
 The Supreme Court confronted a similar issue in Barclays Bank PLC v. Franchise Tax Board, 512 U.S. 298 (1994). There, the Court considered whether California's world wide reporting tax system violated the dormant Commerce Clause.
 
 
 33
 The Supreme Court, after noting that the California tax was constitutional under typical dormant Commerce Clause analysis, evaluated whether the tax's effect on foreign commerce impaired the federal government's ability to speak with "one voice." Id. at 328. The Court held that it did not. Id.
 
 
 34
 The Court noted that Congress had considered, and eventually rejected, legislation that would have precluded state statutes like the one in dispute in Barclays. Id. at 324-28. The Court reasoned that Congress was willing "to tolerate" the states' worldwide-reporting tax statutes. Id. at 327. Significantly, the Court then observed that "the foreign policy of the United States . . . [is] much more the province of the Executive Branch and Congress than of this Court"; therefore, the foreign companies' argument that the California statute "is unconstitutional because it is likely to provoke retaliatory action by foreign governments is directed to the wrong forum." Id. at 327-28 (citation and internal quotation marks omitted).
 
 
 35
 Similarly, in Wardair Canada, Inc. v. Florida Department of Revenue, 477 U.S. 1 (1986), the Court evaluated whether a Florida tax on airline fuel, which increased the tax liability of foreign airlines, prevented the federal government from speaking with "one voice." The Court concluded that the Florida tax did not violate the Commerce Clause. Id. at 12-13. The federal government had entered into more than 70 bilateral aviation agreements, none of which purported to preclude the type of tax enacted by Florida. The Court reasoned:"By negative implication . . . , the United States has at least acquiesced" in the type of statute enacted by Florida. Id. at 12. Moreover, "[i]t would turn dormant Commerce Clause analysis upside down to apply it where the Federal Government has acted, and to apply it in such a way as to reverse the policy that the Federal Government has elected to follow. .. . [T]he Federal Government is entitled in its wisdom to act to permit the States varying degrees of regulatory authority. " Id. (emphasis in original).
 
 
 36
 Barclays and Wardair Canada teach that, before we can hold that an otherwise constitutional state statute[4] that affects foreign commerce is unconstitutional because it prevents the federal government from speaking with "one voice, " we must examine whether the federal government has chosen to permit the states to act. After conducting that examination, we hold that Congress has spoken affirmatively in the area of Holocaust-era insurance policies and has acquiesced in state laws like HVIRA.[5]
 
 
 37
 In 1998, Congress passed the U.S. Holocaust Assets Com-mission Act of 1998 (Holocaust Act), Pub. L. 105-186, 112 Stat. 611, as amended Pub. L. 106-155, S 2, 113 Stat. 1740 (1999) (codified at 22 U.S.C. S 1621 note), in order "to establish a commission to examine issues pertaining to the disposition of Holocaust-era assets in the United States . . . and to make recommendations to the President on further action, and for other purposes." Holocaust Act Intro. The Holocaust Act instructs the Commission to "conduct a thorough study and develop a historical record of" certain assets,"if such assets came into the possession or control of the Federal Government." Id. S 3(a)(1). The Commissioner and Amicus the State of California argue that S 3(a)(4), which concerns Holocaustera insurance policies, is relevant to this litigation:
 
 
 38
 In carrying out its duties under this Act, the Commission shall take note of the work of the National Association of Insurance Commissioners with regard to Holocaust-era insurance issues and shall encourage the National Association of Insurance Commissioners to prepare a report on the Holocaust-related claims practices of all insurance companies, both domestic and foreign, doing business in the United States at any time after January 30, 1933, that issued anyindividual life, health, or property -casualty insurance policy to any individual on any list of Holocaust victims . . . .
 
 
 39
 Id. S 3(a)(4)(A). The report by the National Association of Insurance Commissioners (NAIC) "should include the following, to the degree the information is available": (1) the number of policies issued by insurance companies to victims of the Holocaust; (2) the value of each policy at the time of issue; (3) the total number of policies, and the dollar amounts, that have been paid out; and (4) the total present-day value of assets in the United States of each company. Id. S 3(a)(4)(B). Section 3(a)(3), entitled "Coordination of Activities," states that the Commission "shall, to the maximum extent practicable, coordinate its activities with, and not duplicate similar activities already being undertaken by, private individuals, private entities, or government entities, whether domestic or foreign." (Emphasis added.) Section 3(b) adds that the Commission "shall review comprehensively any research by . . . non-Federal government entities, whether domestic or foreign." (Emphasis added.)
 
 
 40
 The Holocaust Act does not refer in so many words to state legislation as a cause of domestic governments' undertaking this "research," S 3(b), nor does it explain what "work" of NAIC the Commission is to take "note" of,S 3(a)(4). There are several reasons, however, why we read the Holocaust Act to embrace state legislation like HVIRA.
 
 
 41
 NAIC is an organization of insurance regulators from the 50 states. The Holocaust Act asks for detailed information on the Holocaust-related claims practices of "all insurance companies, both domestic and foreign, doing business in the United States at any time after January 30, 1933. " Id. S 3(a)(4)(A) (emphasis added). This information is to include data on individual Holocaust-era policies. Id. If Congress was expecting a detailed report on the claims practices and policies of "foreign" insurance companies from an organization consisting only of state insurance regulators, Congress must have expected that the regulators would be acting pursuant to state law. Congress must also have been aware that, in order to fulfill the Holocaust Act's broad objectives, state insurance commissioners might have to require the foreign affiliates of domestic insurance companies to search a foreign office for information on Holocaust-era policies.
 
 
 42
 Even if Congress' reference to the "work" of NAIC is not, by itself, encouragement of state statutes like HVIRA, Congress was aware that domestic governmental entities were conducting research into the activities of Holocaust-era insurers. As noted, S 3(b) of the Holocaust Act requires the Commission to "review comprehensively any research by . . . non Federal government entities, whether domestic or foreign" (emphasis added), and S 3(a)(3) requires the Commission to "coordinate its activities" with those of domestic governmental entities.
 
 
 43
 The legislative history of the Holocaust Act supports our conclusion that Congress was aware of the states' efforts to obtain information on Holocaust-era insurance policies. In 1998, there was a flurry of activity in Congress relating to Holocaust-era assets. On February 12, 1998, the House Committee on Banking and Financial Services held a hearing on "The Restitution of Art Objects Seized by the Nazis from Holocaust Victims and Insurance Claims of Certain Holocaust Victims and Their Heirs": Hearing Before the House Comm. on Banking & Fin. Servs., 105th Cong. 131 (Feb. 12, 1998).
 
 
 44
 State Insurance Commissioners Quackenbush (of California) and Senn (of Washington) testified at that hearing. Commissioner Senn noted that she chaired the NAIC "Holocaust Insurance Issues Working Group," which was investigating Holocaust-era insurance issues with the help of "state insurance departments." Id. 1998 WL 65380. She explained that NAIC had requested voluntary cooperation from the insurance companies but, "[i]f our requests for cooperation are not satisfied, then the states may begin to exercise [regulatory] powers." Id. "Congress and the States can work together," Commissioner Senn concluded. Id. 105th Cong. at 134. Commissioner Quackenbush added that he had held hearings in California relating to this issue, and he was "prepared to revoke [the] certificate of authority, which allows a company to sell insurance in California, for [any insurance company] and any of its American subsidiaries, if it fails to " provide information on Holocaust-era policies. Id. at 142. The Chair of the House committee, Representative Leach, who sponsored the Holocaust Act two months later, noted:
 
 
 45
 [L]et me say that because this is an issue of international significance, there are aspects of the American system that are not widely understood abroad, and one relates to the Federal nature of America, particularly in the insurance arena, the decision of the United States Congress, in effect, either to devolve or not to assume responsibility for basic insurance regulation, which gives the States a significant role. And that means that as two symbolic State insurance commissioners, there's a great deal of authority that resides in your offices.
 
 
 46
 Id. at 157 (emphasis added).[6] On the basis of the text, context, and history of the Holocaust Act, we conclude that Congress was aware of the states' involvement in this area and, at least implicitly, encouraged laws like HVIRA.
 
 
 47
 Notwithstanding the Holocaust Act, Plaintiffs argue, and the district court held, that HVIRA conflicts with a federal policy relating to "Holocaust victims compensation efforts" as evidenced by three actions undertaken by the executive branch. They are: (1) the Foundation Agreement between Germany and the United States (Foundation Agreement); (2) the International Commission on Holocaust Era Insurance Claims (ICHEIC); and (3) the Swiss-US Joint Statement. The following is a brief summary of each:
 
 
 48
 a. The Foundation Agreement
 
 
 49
 In December 1999, the German government and German companies agreed to fund a DM 10 Billion Foundation to settle Nazi-era claims, in exchange for the voluntary dismissal of lawsuits that had been filed against German companies. The German government has agreed to fund the Foundation when all such claims pending in United States courts have been finally dismissed.
 
 
 50
 On July 17, 2000, the United States and the German government signed the Foundation Agreement. The Agreement recognizes "as legitimate the interest German companies have in all-embracing and enduring legal peace." It also states that "it would be in the interests of both parties for the Foundation to be the exclusive remedy and forum for addressing all claims[ ] that have been or may be asserted against German companies" arising from Nazi-era activities. Foundation Agreement at 2, 4.
 
 
 51
 The United States, in Article 2 of the Foundation Agreement, agreed to the following in pertinent part:
 
 
 52
 (1) The United States shall, in all cases in which the United States is notified that a claim described in article 1 (1) has been asserted in a court in the United States, inform its courts through a Statement of Interest . . . that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive remedy and forum for resolving such claims asserted against German companies . . . and that dismissal of such cases would be in its foreign policy interest.
 
 
 53
 (2) The United States, recognizing the importance of the objectives of this agreement, including allembracing and enduring legal peace, shall, in a timely manner, use its best efforts, in a manner it considers appropriate, to achieve these objectives with state and local governments.
 
 
 54
 Annex B of the Foundation Agreement explains that the United States will "recommend dismissal" of lawsuits "on any valid legal ground." Paragraph seven of Annex B recognizes, however, that the "United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground."
 
 
 55
 b. The ICHEIC
 
 
 56
 The ICHEIC was established in 1998 by NAIC in cooperation with several European insurance companies, European regulators, representatives of non governmental organizations, and the State of Israel. The United States has the status of an "observer." The ICHEIC is a voluntary, private organization that was created with the goal of implementing a "just process . . . that will expeditiously address the issue of unpaid [Holocaust-era] insurance policies." The ICHEIC creates an "International Commission" that is charged with initiating an "investigatory process to determine the current status of those insurance policies . . . for which claims are filed. " To assess the remaining unpaid insurance policies of Holocaust victims, "a reasonable review will be made of the participating companies' files."
 
 
 57
 c. The Swiss-US Joint Statement
 
 
 58
 At the inaugural meeting of the Swiss-US Joint Economic Commission in January 2000, the two countries issued a Joint Statement stating that they "[h]ave decided to endow their partnership with a long-lasting perspective, through continued and institutionalized dialogue." Section 2.4(b) of an "Action Plan" annexed to the Joint Statement notes that many Swiss insurance companies have settled insurance lawsuits, and"U.S. authorities will call on the U.S. State insurance Commissioners and State legislative bodies to refrain from taking unwarranted investigative initiatives or from threatening or actually using sanctions against Swiss insurers."
 
 
 59
 We next consider the effect of those three actions on the validity of HVIRA. Significantly, Plaintiffs do not argue that HVIRA is preempted by any of the three. Instead, Plaintiffs claim that the three actions simply are evidence of a foreign policy with which HVIRA conflicts. We are not persuaded.
 
 
 60
 First, we question whether there is in fact any policy conflict between HVIRA, the enactment of which Congress encouraged in the federal Holocaust Act, and the executive branch initiatives. HVIRA seeks information for two main purposes: enabling victims of the Holocaust to know whether they have insurance claims, and protecting Californians from insurers that have not paid valid claims. The second purpose conflicts with no federal policy of which we are aware. The first is consistent with the overall goal of the three initiatives: to resolve Holocaust-era claims. In other words, the Holocaust Act, HVIRA, and the executive branch initiatives share the same policy objective, although they seek to achieve that policy objective by varying techniques.
 
 
 61
 Second, we note that two of the executive branch initiatives are country-specific. The German Foundation Agreement pertains to German insurers. The Swiss-US Joint Statement pertains to Swiss insurers. That being so, neither of those initiatives governs with respect to Generali (an Italian insurer) or Winterthur (which apparently has affiliates throughout Europe).
 
 
 62
 Third, as Plaintiffs concede, none of the three initiatives has preemptive effect. The German Foundation Agreement mentions the United States' interest in the voluntary dismissal of lawsuits against German corporations and, by its terms, "does not suggest that [the United States' ] policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal" of any lawsuit. Foundation Agreement, Annex B, P 7. The ICHEIC is not an official executive branch action at all; it is a voluntary, private organization in which the United States has the role of a mere observer.
 
 
 63
 Of the three, only the Swiss-US Joint Statement refers specifically to a policy on gathering information about Holocaust-era insurance policies: the executive branch "will call on the U.S. State insurance Commissioners and State legislative bodies to refrain from taking unwarranted investigative initiatives or from threatening or actually using sanctions against Swiss insurers." Swiss-US Joint Statement, Action Plan S 2.4(b). That is hortatory, not mandatory, wording. Buteven if we were to assume that a conflict exists between the Holocaust Act and the Swiss-US Joint Statement with regard to seeking information from Swiss insurers,[7] Congress' action controls in this instance. Article I, S 8 of the United States Constitution expressly grants Congress the authority to regulate foreign commerce. Article II, S 2 of the Constitution grants the executive branch the authority, with the consent of the Senate, to make treaties but, as noted, the Swiss-US Joint Statement is not a treaty, and preemption is not an issue here. Plaintiffs' argument that a "policy interest" found in an executive branch "Joint Statement" creating an Economic Commission trumps Congress' express constitutional authority to regulate foreign commerce is incorrect.[8]
 
 
 64
 In this connection, Plaintiffs draw our attention to letters in which executive branch officials argue that HVIRA does conflict with the federal government's policy concerning Holocaust-era claims. In Barclays, the Supreme Court rejected a similar argument. The plaintiff in Barclays had pointed to "a series of Executive Branch actions, statements, and amicus filings . . . that, taken together, . . . constitute a clear federal directive proscribing States' use of worldwide combined reporting." 512 U.S. at 328 (citation and internal quotation marks omitted). The Court held that the executive branch's actions "cannot perform the service for which [the plaintiff] would enlist them. The Constitution expressly grants Congress, not the President, the power to `regulate Commerce with foreign Nations.' " Id. at 328-29 (quoting U.S. Const. art. I, S 8, cl. 3).
 
 
 65
 In conclusion, the district court erred when it held that Plaintiffs established a likelihood of success on the question whether HVIRA violates the Commerce Clause.
 
 C. The Foreign Affairs Power
 
 66
 The district court also held that Plaintiffs established a probability of success on their claim that HVIRA violates the federal government's power over foreign affairs. The court reasoned, and Plaintiffs argue, that HVIRA has more than an "incidental effect on foreign countries" and has the potential to "disrupt and embarrass" the federal government in the field of foreign relations. We disagree as a matter of law.
 
 1. Relevant Law
 
 67
 The federal government's foreign affairs power is not mentioned expressly in the text of the Constitution but, rather, is derived from the structure of the Constitution and the nature of federalism.[9] See generally Harold G. Maier, Preemption of State Law: A Recommended Analysis, 83 Am. J. Int'l L. 832, 836-37 (1989). The power is rarely invoked by the courts; the Supreme Court has not applied it in more than 30 years, since Zschernig v. Miller, 389 U.S. 429 (1968).
 
 
 68
 The plaintiff in Zschernig challenged an Oregon probate law that allowed a foreign citizen to inherit from a decedent's estate only if United States citizens could inherit from a decedent's estate in the foreign citizen's country. The Supreme Court had held in Clark v. Allen, 331 U.S. 503, 517 (1947), that a California probate law with a similar reciprocity provision did not, on its face, violate the Constitution, because the statute had only "some incidental or indirect effect in foreign countries." In Zschernig, the Court refused to reconsider its facial holding in Clark, but held that Oregon's statute, as applied, was an unconstitutional "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." 389 U.S. at 432-33.
 
 
 69
 The Court in Zschernig pointed, with disapproval, to many examples of judges' pontificating on the policies of foreign nations. Id. at 433-34. The Court concluded that "the type of probate law that Oregon enforces affects international relations in a persistent and subtle way." Id. at 440. The Court observed that " `international controversies of the gravest moment, sometimes even leading to war, may arise from realor imagined wrongs to another's subjects inflicted, or permitted, by a government.' " Id. at 441 (quoting Hines v. Davidowitz, 312 U.S. 52, 64 (1941)). Here, of course, we address a facial (Clark), not an as-applied (Zschernig) challenge.
 
 
 70
 The parties call our attention to two more recent cases in which other circuit courts have confronted a foreign affairs challenge. In National Foreign Trade Council v. Natsios, 181 F.3d 38, 51-52 (1st Cir. 1999), the First Circuit held that a Massachusetts law that prohibited state agencies from purchasing goods from companies doing business with a specific country, Burma (the Burma Law), violated the foreign affairs power, the dormant Commerce Clause, and the Supremacy Clause. Notably, the Supreme Court affirmed the First Circuit's ruling that the Burma Law was preempted by federal law under the Supremacy Clause, but the Court did not rule on the foreign affairs question. Crosby v. National Foreign Trade Council, 120 S. Ct. 2288, 2294-95 n.8 (2000).
 
 
 71
 In Trojan Technologies, Inc. v. Pennsylvania, 916 F.2d 903 (3d Cir. 1990), a Canadian corporation argued that a Pennsylvania "Buy American" law violated the foreign affairs power. The Third Circuit held that the statute did not violate the Commerce Clause, the Supremacy Clause, or the foreign affairs power. The court reasoned that "any state law that involves the state in the actual conduct of foreign affairs is unconstitutional," but "any action that has only some incidental or indirect effect in foreign countries" is not. Id. at 913 (citation and internal quotation marks omitted). The court then held that the "Buy American" statute "exhibits none of the dangers attendant on the statute reviewed" in Zschernig, because: (1) Pennsylvania's statute provided no opportunity for state officials to comment on the nature of foreign regimes; (2) the Pennsylvania statute, on its face, did not single out any particular foreign country; (3) there was no evidence that the statute had been applied selectively according to attitudes concerning foreign policy; and (4)there was evidence that Congress had recently directed its attention to "Buy American" statutes, but did not take steps to preempt them.[10] Id. at 913-14; see also K.S.B. Technical Sales Corp. v. North Jersey Dist. Water Supply Comm'n, 381 A.2d 774, 784 (N.J. 1977) (holding that New Jersey's "Buy American" statute did not violate the foreign affairs power because it did not "result demonstrably in a significant and direct impact upon foreign affairs"). But see Bethlehem Steel Corp. v. Board of Comm'rs, 276 Cal. App. 2d 221, 225-27 (Ct. App. 1969) (holding that a California "Buy American" statute violated the foreign affairs power).
 
 2. Zschernig Does Not Apply to HVIRA
 
 72
 We are not persuaded that Zschernig applies to HVIRA. In Zschernig, the Oregon probate statute violated the foreign affairs power because, as applied, it allowed Oregon judges to insult foreign nations. 389 U.S. at 433-35. In Clark, the Court held that a similar California statute, on its face, did not violate the Constitution. See Zschernig, 389 U.S. at 432 (noting that, in Clark, the Court held that "a general reciprocity clause did not on its face intrude on the federal domain"). HVIRA regulates insurance companies that do business in California and are, or are related to, companies that issued Holocaust-era insurance policies. No Plaintiff is a foreign government, nor is any Plaintiff owned in whole or in part by a foreign government; they are, simply, businesses. Unlike the statute considered in Natsios, HVIRA does not refer to any particular country. As in Trojan, there is no evidence that HVIRA would be applied in a way that would implicate the diplomatic concerns mentioned in Zschernig.
 
 
 73
 Because Zschernig has been applied so sparingly, because Clark remains intact, and because the Supreme Court's foreign commerce cases have taken a different approach (as we discussed above), we hesitate to apply Zschernig to a facial challenge to state statutes involving "foreign affairs" (a) but that mainly involve foreign commerce and (b) that are not directed at a particular country. HVIRA, on its face, involves commerce alone, and it is not, on its face, directed at any particular foreign country. For those reasons, we conclude that Zschernig does not govern.
 
 D. The Due Process Clause Claim
 
 74
 Plaintiffs Generali and Winterthur argue that HVIRA violates the "legislative prong" of the Due Process Clause, which "limits the power of a forum state to apply its substantive law to factual and legal situations with which it has little or no contact." Additionally, Winterthur argues that HVIRA "violates the most basic notions of fundamental fairness " because it takes "away the licenses of California insurers for failure to perform tasks that are literally impossible." Moreover, Winterthur asserts, the reporting requirement is "arbitrary and irrational."
 
 
 75
 Plaintiffs cite a recent case, Gerling Global Reins. Corp. v. Nelson, 123 F. Supp. 2d 1298, 1303-04 (N.D. Fla. 2000), in which the District Court for the Northern District of Florida held that a Florida Holocaust-era insurance statute violates the legislative prong of the Due Process Clause. The court noted that, under Eleventh Circuit precedent, there must be " `some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction.' " Id. at 1301 (quoting American Charities for Reasonable Fundraising Reg., Inc. v. Pinellas County, 221 F.3d 1211, 1216 (11th Cir. 2000)).
 
 
 76
 It is possible that HVIRA violates the Due Process Clause, but the district court did not reach that issue, and it is not fully developed in the record or in the briefs presented to this court. We leave the preliminary injunction in place in order to give the district court an opportunity to consider whether Plaintiffs are likely to succeed on the merits.[11] (Defendant does not challenge the district court's conclusion that Plaintiffs established a likelihood of irreparable harm; they may lose the right to continue to do business in California if the statute takes effect.)
 
 CONCLUSION
 
 77
 We hold that the district court erred when it decided that HVIRA violates the dormant Commerce Clause and the foreign affairs power. However, because the district court has not addressed Plaintiffs' claim that HVIRA violates the Due Process Clause, we leave the preliminary injunction in place and remand for further proceedings.
 
 
 78
 Preliminary injunction AFFIRMED; REMANDED for further proceedings.
 
 
 
 Notes:
 
 
 *
 Harry W. Low is substituted for his predecessor as Commissioner of Insurance for the State of California. Fed. R.App. P. 43(c)(2).
 
 
 [1]
 The information that the insurance companies must provide is: (1) the number of insurance policies; (2) the holder, beneficiary, and current status of each policy; and (3) the city of origin, domicile, or address for each policyholder listed in each policy. Cal. Ins. CodeS 13804(a)(1)-(3). In addition, the insurer must certify that: (1) the proceeds of the policies were paid; or (2) the beneficiaries or heirs could not be located after diligent search, and the proceeds were distributed to Holocaust survivors or charities; or (3) a court of law has certified a plan for distributing the proceeds; or (4) the proceeds have not been distributed. Id. S 13804(b)(1)-(3). The implementing regulations state that, if "the insurer states that it has no actual policies to report because the records are no longer in the possession of the insurer or its related company(ies), it shall provide a complete explanation of that statement." Cal. Code Regs. tit. 10, S 2278.2(a) (2000). Any insurer who knowingly files false information is subject to a penalty of up to $5,000. Cal. Ins. Code S 13805.
 
 
 [2]
 The state requests information from foreign insurers in other contexts, too. For example, California Insurance Code S 699.5 (1994) requires insurers that are owned, operated, or controlled by other governments to provide information so that the Commissioner can determine whether "the insurer is subject to any form of subsidy that would enable it to compete unfairly with domestic insurers."
 
 
 [3]
 Plaintiffs implicitly recognize that HVIRA regulates the "business of insurance." Seeking information from insurers about their claims-paying record, to be used in the licensing process, is a form of regulating the business of insurance.
 
 
 [4]
 In both Barclays and Ward air Canada, the state statute was "otherwise constitutional" because it did not discriminate against interstate commerce, while in the present case HVIRA is "otherwise constitutional" because of the McCarran Act.
 
 
 [5]
 A much stronger case for congressional acquiescence exists here than in Wardair Canada or Barclays. In those cases, the Court inferred congressional acquiescence by negative implication. In the present case, however, we need not draw a negative inference from what Congress did not say, but can draw a positive inference from what Congress did say in the Holocaust Act.
 
 
 [6]
 Representative Leach submitted a draft of the bill, H.R. 3662, to the House on April 1, 1998. See 1998 Cong. Q. 3662, 105th Cong., 2d Sess.
 
 
 [7]
 It is unclear from the Swiss-US Joint Statement what "investigative initiatives" by "State legislative bodies" are considered to be "unwarranted." (Emphasis added.) By implication, states may seek information if the inquiry is "warranted." Arguably, the Holocaust Act is a statement from Congress that statutes like HVIRA are warranted.
 
 
 [8]
 Cf. Louis Henkin, Foreign Affairs and the U.S. Constitution 89 (2d ed. 1996) ("Whatever, then, the President might have authority to do by treaty or other international agreement, he cannot unilaterally regulate commerce with foreign nations . . . .").
 
 
 [9]
 The foreign affairs power also has been referred to as "dormant foreign relations preemption." Curtis A. Bradley & Jack L, Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 864 (1997); see also Harold Hongju Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824, 1847 (1998).
 
 
 [10]
 The Trojan court's fourth reason echoes the reasoning of the foreign commerce cases, Barclays and Wardair Canada, discussed, in Part B(3), above.
 
 
 [11]
 Defendant acknowledged at oral argument that a serious question may exist concerning HVIRA and the Due Process Clause. When questioned about whether HVIRA requires that the Commissioner suspend the license of a California insurer who is unable to produce the information required by HVIRA, either because of European privacy laws or because the company has no control over the information, counsel stated that HVIRArequires the suspension of the license nonetheless. Counsel then said that the issue "is really a due process issue" and that any evidence of a company's inability to produce information should be evaluated "as part of a due process analysis, and that's where we think that issue properly lies."