**GERLING GLOBAL REINSURANCE CORP. OF AMERICA, et al., Plaintiffs,**

**v.**

**Harry LOW, in his capacity as the Insurance Commissioner of the State of California, Defendant.**

Nos. CIV.S–00–0506 WBS JFM, CIV.S–00–0613 WBS JFM, CIV.S–00–0779 WBS JFM, CIV.S–00–0875 WBS JFM.

United States District Court, E.D. California.

Oct. 2, 2001.

Louis H. Castoria, Debra S. Sturmer, Wilson Elser Moskowitz Edelman and Dicker, San Francisco, CA, Frederick W. Reif, James P. Donovan, Wilson Elser

Moskowitz Edelman and Dicker, New York City, Michael W. McConnell, Mayer Brown and Platt, Chicago, IL, Neil M. Soltman, Mayer Brown and Platt, Los Angeles, CA, Kenneth S. Geller, Mayer Brown and Platt, Washington, DC, Martin S. Checov, O'Melveny and Myers, San Francisco, CA, Stephen M. Shapiro, Mayer Brown and Platt, Chicago, IL, Chandra L. Gooding, Milbank Tweed Handley and McCloy, Los Angeles, CA, Peter Simshauser, Skadden Arps Slate Meagher and Flom, Los Angeles, CA, for plaintiffs.

Frank Kaplan, Alschuler Grossman and Pines, Los Angeles, CA, Andrew W. Stroud, Mennemeier Glassman and Stroud, Sacramento, CA, for defendants.

### MEMORANDUM AND ORDER

SHUBB, Chief Judge.

In October 1999, California enacted the Holocaust Victim Insurance Relief Act ("HVIRA"). *See* Cal. Ins.Code §§ 13800–13807 and accompanying regulations, Cal. Code Regs. Tit. 10 §§ 2278–2278.5. HVIRA relates to claims asserted by Holocaust victims or their heirs or beneficiaries for coverage under insurance policies issued in Europe between 1920 and 1945. The stated purpose of HVIRA is to ensure that insurance companies doing business in the State of California disclose to the state "any involvement they or their related companies may have had with insurance policies of Holocaust victims." Cal. Ins. Code § 13801(e). HVIRA further declares that insurers in California have a responsibility to "ensure the rapid resolution of these questions [regarding unpaid Holocaust-era insurance policies], eliminating further victimization of these policyholders and their families." *Id.*

After briefing and a hearing regarding various constitutional challenges to the statute, this court found, in June of 2000, that plaintiffs had shown a probability of success on the merits of two of their claims: (1) that HVIRA interferes with the federal government's control over foreign affairs; and (2) that HVIRA violates the Commerce Clause, and therefore granted a preliminary injunction enjoining enforcement of the statute. The Ninth Circuit reversed the holdings upon which that injunction was based, but left the injunction in place, specifically referencing the "possibility" that HVIRA violates the Due Process Clause. *Gerling Global Reins. Corp. of Am. v. Low,* 240 F.3d 739, 754 (9th Cir.2001), *petition for cert. filed* (U.S. June 26, 2001) (No. 00–1926).

The matter is now before this court on the parties' cross motions for summary judgment. All plaintiffs jointly move for summary judgment on the grounds that HVIRA violates the Due Process Clause because: (1) it is an extraterritorial regulation enacted in excess of California's legislative jurisdiction; and (2) it mandates the performance of impossible tasks and provides for automatic license revocation upon non-performance. Defendant moves for summary judgment, and for the preliminary injunction to be dissolved, on the grounds that: (1) the Ninth Circuit's decision precludes any claim that HVIRA violates either the Foreign Affairs Power or the Commerce Clause; (2) HVIRA does not violate the Due Process Clause; and (3) HVIRA is not unconstitutional for any other reason raised in any plaintiff's complaint.

### I. *Facts*

#### A. *The Statututory Framework*

After the National Socialist (NAZI) party came to power in Germany, it enacted a series of statutes authorizing governmental confiscation of Jewish property and other assets. These laws included insurance proceeds among the types of property that the government was authorized to seize from Jews. Under the NAZI statutes, German insurers were required to

pay the proceeds of insurance policies of Jewish residents to "blocked accounts" controlled by the NAZI government. A 1943 statute also ordered confiscation of the estates of deceased Jews. Furthermore, although many Holocaust victims had insurance policies, many lost the papers during their imprisonment. In many cases, the persons most knowledgeable about the policy were killed, leaving heirs without a paper trail. As a result, many Holocaust victims and their descendants and heirs have never collected on their insurance policies.

HVIRA requires insurance companies doing business in California to file reports disclosing policies issued in Europe during the period 1920–1945. *See* Cal. Ins.Code §§ 13800–13807. Other enabling statutes extend the statute of limitations for filing such claims (Cal.Civ.Proc.Code § 354.5), and provide procedures for the suspension of licenses of insurance companies who have not paid valid claims (Cal. Ins.Code § 790.15).[1]

### B. The Challenged Statute: California Insurance Code §§ 13800–13807 ("HVIRA")

HVIRA obligates insurers doing business in California to file reports identifying insurance policies (life, property, liability, health, annuities, dowry, educational, or casualty) sold to persons in Europe between 1920 and 1945 directly or through a "related company." Cal. Ins.Code § 13804(a). A "related company" is defined as "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer." Cal. Ins.Code § 13802(b).

Specifically, the statute requires the insurer or related company to file with the registry: (1) the number of those insurance policies; (2) the holder, beneficiary, and current status of those policies; and (3) the city of origin, domicile, or address for each policy holder. Cal. Ins.Code § 13804(a). Filing false information under this section is punishable by civil penalties of up to $5,000.00 per policy.

Further, with regard to each policy, the insurer must certify one of the following: (1) that the proceeds of the policies have been paid to the designated beneficiaries or their heirs where that person or persons, after diligent search, could be located and identified; (2) that the proceeds where the beneficiaries or heirs could not, after diligent search, be located or identified, have been distributed to Holocaust survivors or to qualified charitable nonprofit organizations for the purpose of assisting Holocaust survivors; (3) that a court of law has certified in a legal proceeding resolving the rights of unpaid policyholders, their heirs, and beneficiaries, a plan for the distribution of the proceeds; or (4) that the proceeds have not been distributed and the amount of those proceeds. Cal. Ins.Code § 13804(b).[2]

The statute also directs that, if the reports are not filed by the 210th day after the HVIRA becomes effective, the Commissioner "*shall* suspend the certificate of authority to conduct insurance business in

---

1. Defendant's motion to dismiss plaintiffs' constitutional challenges to Cal.Civ.Proc.Code § 354.5(c) and Cal. Ins.Code § 790.15(c) for lack of standing was granted in June of 2000.

2. The term "proceeds" is defined in the statute as "the face value or other payout of insurance policies and annuities plus reasonable interest to date of payment without diminution for wartime or immediate postwar currency devaluation." Cal. Ins.Code § 13802(c).

the state...." Cal. Ins.Code § 13806. (emphasis added).

## C. *The Parties*

Defendant is Harry Low in his capacity as the Commissioner of Insurance of the State of California. Plaintiffs are insurance companies licensed to do business in California. Four sets of plaintiffs originally filed separate complaints against then-Insurance-Commissioner Chuck Quackenbush. Those cases were consolidated as the present action and the plaintiffs now move jointly.

### 1. *Gerling Global Reinsurance Corporation of America ("the Gerling plaintiffs")*

The Gerling plaintiffs are five insurance companies licensed to do business in California. They are "related to" or "affiliated" with two German companies (Gerling–Konzern Allgemenine Versicherungs–AG ("GKA") and Gerling–Konzern Lebensversicherungs–AG ("GKL")) that issued policies in Europe during the proscribed time period.

GKA and GKL do not conduct any business in the State of California either directly or through the Gerling plaintiffs. None of the Gerling plaintiffs is in possession, custody or control of records pertaining to any insurance policies in force in Europe at any time between 1920 and 1945. Further, the Gerling plaintiffs contend that they have no means to compel such information from their German affiliates. GKA and GKL believe that if they produce the information demanded by the HVIRA, they will face criminal and civil penalties under German law.[3]

### 2. *American Insurance Association and American Re–Insurance Co. (the "American plaintiffs")*

The American plaintiffs are American Insurance Association ("AIA") and American Reinsurance Company ("AmRe"). AIA is a national trade association of insurers, some of whom do business in California. AIA principally represents American insurance companies that did not issue insurance policies in Europe during the relevant period and do not own or control any companies that did.[4] Several members of AIA are, however, "related to" European companies that issued policies during the relevant time period. AIA's affected members contend that they lack the corporate authority to compel their related European companies to produce the information required by the HVIRA. Further, plaintiffs believe that the law of the related European company's country forbids the disclosure of the kind of information required by HVIRA.

AmRe is a large insurance company licensed to do business in California. Neither AmRe, nor any subsidiary or affiliate over which it has control, issued insurance policies that were in effect in Europe from 1920 to 1945. AmRe is subject to the HVIRA's reporting requirements because it is "related," through its parent corporation, Munich Re, to two European insurers that issued insurance policies in Europe from 1920 to 1945. AmRe contends that neither AmRe nor Munich Re has the corporate authority to compel these European companies to produce the information required by the HVIRA. Further, according to AmRe, Munich Re believes it would have to violate German law in order to comply with HVIRA.

---

3. The parties have submitted competing expert declarations reaching differing conclusions as to whether German privacy law actually does preclude the HVIRA-mandated disclosures.

4. American Insurance does represent Assicurazioni Generali, a European Company discussed separately herein.

### 3. *Winterthur International American Insurance Co., et al. ("the Winterthur plaintiffs")*

The Winterthur plaintiffs are nine insurance companies licensed to do business in California. None of the companies ever issued insurance policies in Europe during the applicable time period, though each is "related" to such a company. Each plaintiff claims, however, that it is not in possession, custody, or control of any records pertaining to insurance policies sold by "related companies." Further, the Winterthur plaintiffs contend that they lack the corporate authority to compel the production of the information required by the HVIRA. They also believe that to do so would violate European law.

### 4. *Assicurazioni Generali, S.p.A. ("Generali")*

Generali is an Italian corporation licensed to do business in California. It issued insurance policies in Europe during the applicable time period. The policies in question were issued in Europe to European insureds. According to Generali, these policies typically incorporated terms and conditions regulated by the laws of the country of issuance. For example, local laws "typically" required that reserves earmarked for these policies were to be maintained in the country of issuance and invested locally. (Carnicelli Decl. ¶ 3.). Apparently, some of the policies also included forum selection clauses requiring that disputes be heard in the country of issuance.

Though Generali cannot make the argument that it lacks the corporate authority to obtain the information necessary to comply with HVIRA, it has joined the joint motion arguing that making those disclosures would violate German law and subject the company to criminal and civil penalties.

### D. *Defendant's Enforcement and Interpretation of the HVIRA Statutory and Regulatory Scheme*

#### 1. *Prior to the Preliminary Injunction*

Prior to the issuance of the preliminary injunction, then-Commissioner Chuck Quackenbush actively threatened enforcement against all plaintiffs. He subpoenaed many insurance companies, including plaintiffs and those represented by plaintiffs, to appear at a hearing on December 1, 1999. At that hearing, Quackenbush informed the insurance companies, "[t]his issue will be resolved in California. I promised that for the last two years. And on April 6th, you're going to see just how serious California is if you have not complied with this law." (Agel Decl., Ex. 18, Transcript of December 1, 1999 Investigatory Hearing, 14:16–20). He told Generali specifically, "I want you to take back to your officers in Italy and everywhere else, that you might want to consider seriously leaving the State, because it's obvious to me right now that you have no intention of complying with the law." (Agel Decl., Ex. 18, 49:12–16). At the end of questioning Generali, Quackenbush stated generally, "[i]t is your choice now whether you're going to work with this Department of Insurance to bring your company in full compliance, whether you're going to leave the state voluntarily, or whether I'm going to kick you out. That's your three choices." (Agel Decl., Ex. 18, 51:19–23).

The preliminary injunction has prevented any such action as of yet. Meanwhile, there has been a change of leadership at the Department of Insurance, and plaintiffs have taken discovery regarding the manner in which the Department interprets and would implement HVIRA.

#### 2. *Since the Preliminary Injunction*

Leslie Tick, a senior counsel at the California Department of Insurance who is

responsible for administering HVIRA, gave deposition testimony in this case as the Department's spokesperson on July 5, 2001. She testified that the only defense to non-compliance with HVIRA's reporting requirements is that the required documents do not exist. Failure to comply for any other reason, including lack of the corporate authority to compel production of the information or a belief that doing so would violate applicable European law, will trigger a license suspension action. (Agel Decl., Ex. 17, Tick Depo. at 227:9–238:17, 252:13–266:16).

Under questioning as to how HVIRA's mandatory suspension provision would be carried out by the Department, Ms. Tick further testified that a license suspension proceeding would involve a hearing before an administrative law judge to determine whether the insurer had complied with the statute. The judge would not, however, be able to exercise any discretion in his determination depending on whether the insurer was participating in good faith in ICHEIC, or whether the insurer could show that it did not control the information sought by HVIRA, or whether it could show that it or its affiliates were barred from producing the information by European privacy laws. *Id.* at 175:5—176:13.

## II. *The Standard*

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. *Plaintiffs' Joint Motion for Summary Judgment*

Plaintiffs jointly move for summary judgment on the ground that HVIRA is an unconstitutional violation of the Due Process Clause of the U.S. Constitution.

### A. *Law of the Case Doctrine*

The parties dispute both the meaning and effect of the Ninth Circuit's decision in *Gerling v. Low,* 240 F.3d 739 (9th Cir. 2001). As a threshold matter, it must be determined what issues are now properly before this court.

Defendant contends that the Ninth Circuit's *Gerling v. Low* opinion "effectively disposes of" all of plaintiffs' claims. Defendant argues: (1) that the Ninth Circuit's ruling finally disposes of plaintiffs' Commerce Clause and Foreign Affairs Power arguments; and (2) that the following language from the opinion precludes any argument that the statute regulates extraterritorially because it is controlling under the "law of the case" doctrine: "HVIRA is a California insurance regulation of California insurance companies . . . [and] does not regulate foreign insurance policies, or control the substantive conduct of a foreign insurer, or otherwise affect the 'business of insurance' in any other country." *Id.* at 746.

Under the "law of the case" doctrine a decision of the court in a prior appeal must

be followed in all subsequent proceedings in the same case. *Eichman v. Fotomat Corporation,* 880 F.2d 149, 157, (citing *Waggoner v. Dallaire,* 767 F.2d 589, 593 (9th Cir.1985)), *cert. denied,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 601 (1986). This rule applies unless the first decision is clearly erroneous and would result in manifest injustice, an intervening change in the law has occurred, or the evidence on remand is substantially different. *Id.* It applies even where the first panel's holding was "cryptic and somewhat ambiguous." *Hanna Boys Ctr. v. Miller,* 853 F.2d 682, 687 (9th Cir.1988); *see also Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (the relevant inquiry on a law of the case question is whether a court previously decided an issue, not whether, or how well it explained the decision); *and Leslie Salt Co. v. United States,* 55 F.3d 1388, 1392 (9th Cir.1995) (even issues treated summarily, without detailed explanation or analysis, become the law of the case).

While affirming this court's grant of plaintiffs' motion for a preliminary injunction, the Ninth Circuit ruled as follows:

> We hold that the district court erred when it decided that HVIRA violates the dormant Commerce Clause and the foreign affairs power. However, because the district court has not addressed Plaintiffs' claim that HVIRA violates the Due Process Clause, we leave the preliminary injunction in place and remand for further proceedings.

*Gerling v. Low,* 240 F.3d at 754.

As for the question of which legal issues remain open, the Court of Appeals in this case was quite explicit. It unambiguously intended to close the questions of HVIRA's constitutionality under the Commerce Clause or Foreign Affairs Power, but, just as clearly, it intended to leave open the question of whether the statute violates the Due Process Clause.

Defendant cites *Eichman,* 880 F.2d at 157, for the proposition that the law of the case doctrine encompasses both "a court's explicit decisions" and those "decided by necessary implication" and therefrom argues that the Ninth Circuit's prior ruling disposes of all of plaintiffs' claims, including the Due Process claims. Given its affirmation of the preliminary injunction and the specific language of its remand, the Ninth Circuit's opinion in this case cannot reasonably be read to "necessarily imply" that plaintiffs' due process claims are foreclosed.

■ For their part, plaintiffs contend that the Ninth Circuit's legal rulings should be given no weight at all on summary judgment because plaintiffs' pending Supreme Court certiorari petition renders the Commerce Clause and Foreign Affairs Power arguments unripe for decision. Plaintiffs argue that "[n]o purpose would be served by entering judgment on these claims, only to have the Supreme Court grant certiorari in October and reverse the Ninth Circuit on the merits." This court, however, is bound by existing rulings of the Ninth Circuit unless and until they are withdrawn or overturned; justice is not served by the type of speculative delay plaintiffs advocate.

■ Defendant's argument that certain factual findings are also the law of the case requires a slightly different analysis. Defendant's argument focuses on the Ninth Circuit's finding that HVIRA does not regulate foreign insurance policies, control the conduct of foreign insurers, or otherwise affect the "business of insurance" in foreign countries. *Gerling v. Low,* 240 F.3d at 746. This was a factual finding made in a "foreign commerce" context during an interlocutory appeal of a preliminary injunction. Findings on interlocutory appeals of preliminary injunctions do not generally constitute "law of the

case". *City of Angoon v. Hodel,* 803 F.2d 1016, 1024 n. 4 (9th Cir.1986) (citations omitted).

The basis for distinguishing between factual findings made on direct appeal and factual findings made on interlocutory appeal of a preliminary injunction is that "the standard of review for factual determinations on direct appeal is higher than the standard applied during an interlocutory appeal of a preliminary injunction." *Royal Insurance Co. v. Quinn–L Capital Corp.,* 3 F.3d 877, 881 (5th Cir.1993). Where, as here, a factual finding (i.e., that a statute regulates foreign conduct) did not survive the lower standard of review, it is arguably unlikely that the same or similar finding would have survived or will survive the higher standard of review applied by the same court on direct appeal. This reasoning weighs in favor of applying the law of the case doctrine to all of the Court of Appeals' findings.

There are, however, likely to be contextual distinctions when a proposed factual finding is analyzed under or applied to disparate constitutional claims. Consequently, this court does not read the Ninth Circuit's opinion in this case to preclude plaintiffs from arguing that HVIRA regulates extraterritorially for the purposes of making their due process arguments. No aspect of plaintiffs' due process argument is now foreclosed by the "law of the case" doctrine.

**B.** *Due Process*

The Ninth Circuit left the preliminary injunction in place and specifically remanded to this court for consideration of the constitutionality of HVIRA under the Due Process Clause. All plaintiffs now challenge the statute on two due process

grounds: (1) that it is an extraterritorial regulation enacted in excess of the state's legislative jurisdiction; and (2) that it mandates the performance of impossible tasks and provides for automatic license revocation upon non-performance.

> 1. *Whether HVIRA Violates Due Process Because it Was Enacted in Excess of California's Legislative Jurisdiction*

■ Plaintiffs argue that HVIRA violates the Due Process Clause because it was enacted in excess of California's legislative jurisdiction. Defendant counters that, as a mere "licensing and reporting statute," HVIRA is a proper exercise of California's legislative jurisdiction.[5]

■ "Legislative jurisdiction" is a concept that courts have applied to describe the due process limits on the legislative power of a state. It is a concept employed to "determine the extraterritorial reach of a statute." *Adventure Communications Inc. v. Kentucky Registry of Election Finance,* 191 F.3d 429, 435 (4th Cir.1999) (quoting *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting)). Like other jurisdictional doctrines, legislative jurisdiction is a threshold question. Applying guidelines similar to those used to determine personal jurisdiction, it requires that a state must have a significant contact or significant aggregation of contacts, creating state interests, such that application of its law is neither "arbitrary nor fundamentally unfair." *Adventure Communications,* 191 F.3d at 436–37 (citing *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)).

---

**5.** Plaintiffs also argue that "[s]ince the HVIRA does not regulate extraterritorially, plaintiff's legislative jurisdiction claims fail as a matter of law." For reasons discussed above, however, the court rejects defendant's contention that plaintiffs' legislative jurisdiction arguments are precluded by the law of the case doctrine.

While noting that "it is possible that HVIRA violates the Due Process Clause," the Ninth Circuit made specific reference to *Gerling Global Reins. v. Nelson*, 123 F. Supp 2d 1298 (N.D.Fla.2000), a recent Florida district court case that invalidated a Holocaust-era insurance statute on legislative jurisdiction grounds. The distinctions between Florida's statute and California's HVIRA are illustrative of the purpose and effect of the legislative jurisdiction doctrine.

Florida's "Holocaust Victims Insurance Act," § 626.943, Fla. Stat. (1999), like California's HVIRA, requires insurers doing business in Florida to provide extensive information to the Florida Department of Insurance regarding policies issued to Holocaust victims by the insurers themselves or by any "parent, subsidiary, or affiliated company." § 626.9543(3)(d) & (7), Fla. Stat. (1999). The Florida statute also requires, however, that insurers actually pay claims on those policies, if such claims are established under a "reasonable, not unduly restrictive, standard of proof." § 626.9543(5)(b), Fla. Stat. (1999). Moreover, through its implementing regulations, it requires insurers doing business in Florida to pay not only their own claims but also to pay claims against any parent, subsidiary or corporate affiliate. *See* Rule 4–137.010(6), Fla. Admin. Code.

The Florida statute plainly attempted to exercise jurisdiction over the specific enforcement of European insurance contracts. In fact, the Florida Insurance Commissioner did not even try to justify the statute as a "means of determining whether plaintiffs themselves or their officers are fit to engage in the business of insurance in Florida," but instead acknowledged to the *Nelson* court that the statute's goal was to "bring about payment of amounts due." *Nelson*, 123 F.Supp 2d 1298, 1303 n. 9. Not surprisingly, the *Nelson* court held that "the efforts of the State of Florida to reach transactions entered in Germany between German parties having no connection with Florida are beyond the state's jurisdiction." *Id.* at 1304.

Plaintiffs in this case argue that "similar legislative findings" preceded enactment of the California and Florida statutes. Those similarities, however, do not overcome the differences in the actual language and effect of the two statutes. Florida's statute is a far more direct attempt to "regulate extraterritorially," as contemplated by the legislative jurisdiction doctrine, than is HVIRA. Most notably, HVIRA lacks any mandate requiring insurers to actually pay claims. Plaintiffs have not established that HVIRA violates due process because it was enacted in excess of the state's legislative jurisdiction. Plaintiffs' motion for summary judgment on that ground must therefore be denied.

2. *Whether HVIRA Violates Due Process Because it Mandates the Performance of Impossible Tasks and Provides for Automatic License Revocation upon Non–Performance*

a. *Whether a license to do business as an insurer is a protected property interest for purposes of a Fourteenth Amendment analysis.*

The "threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994); *Kraft v. Jacka*, 872 F.2d 862, 866 (9th Cir.1989). Courts have long wrestled with the question of exactly what "interests" the Fourteenth Amendment protects. Trying to define the constitutional con-

cepts of "property interest" and "due process," early U.S. Supreme Court decisions looked back as far as the signing of the Magna Carta, "when the great barons of England wrung from King John, at the point of the sword, the concession that neither their lives nor their property should be disposed of by the crown." *Davidson v. New Orleans*, 96 U.S. 97, 102, 24 L.Ed. 616 (1877). More recently, we have recognized that our definition of a Fourteenth–Amendment–protected property interest is rooted in the idea that our property interests provide our "sources of security." *See Goldberg v. Kelly*, 397 U.S. 254, 263 n. 8, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (quoting Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues*, 74 Yale L.J. 1245, 1255 (1965)).

For decades now, courts have recognized protected property interests in many forms which fall outside the norm of common-law property. *See e.g. Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)(individual's interest in continued receipt of social security benefits is a statutorily-created property interest for purposes of a due process analysis); *and Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)(the rights of a party under a patent are a protected property interest for purposes of a due process analysis). Indeed, the Supreme Court has made it abundantly clear that "the property interests protected by due process extend well beyond actual ownership of real estate, chattels, or money." *Roth*, 408 U.S. at 571–72, 92 S.Ct. 2701 (citing *Connell v. Higginbotham*, 403 U.S. 207, 208, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971)).

Courts have also long recognized that licenses which enable one to pursue a profession or earn a livelihood are protected property interests for purposes of a Fourteenth Amendment analysis. "Once licens-es are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)(addressing suspension of drivers' licenses). The Ninth Circuit has specifically recognized that an existing license, in contrast to an applied-for license, constitutes a legitimate entitlement of which one cannot be deprived without due process. *See Greenwood v. Federal Aviation Administration*, 28 F.3d 971, 975 (9th Cir.1994)(addressing suspension of pilot's license).

The Commissioner nonetheless advances the argument that doing business as an insurer in California is a "mere privilege" which, he argues, can be summarily withdrawn for "any legitimate reason" the State chooses, divines or fashions. Categorizing plaintiffs' licenses as "privileges" bestowed by the state does not immunize their suspension from a due process challenge. The Supreme Court has specifically "rejected the concept that constitutional rights turn upon whether a government benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). An existing license to do business as an insurer in California is a property interest deserving of Fourteenth Amendment protection. Any action to suspend such a license must therefore be taken in conformity with the requirements of procedural due process.

b. *Ripeness of plaintiff's procedural due process challenge*

"Ripeness is peculiarly a question of timing." *Thomas v. Union Carbide*

*Agric. Prod. Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). "Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Id.* In considering whether a case is ripe for review, a court must evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Winter v. California Med. Review, Inc.,* 900 F.2d 1322, 1325 (9th Cir.1989).

■ "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." 15 Moore's Fed. Practice, § 101.76[1][a] (3d ed.1999); *see also Union Carbide,* 473 U.S. at 580–81, 105 S.Ct. 3325 (noting that a central component of the fitness for review factor is whether the motion involves uncertain or contingent future events that may never occur.) Though a procedural due process challenge here might theoretically be susceptible to the argument that it will not ripen until plaintiffs have actually been deprived of their protected property interest (i.e. until the Commissioner has made a final determination that plaintiffs' licenses should be suspended), the record in this case is now developed to the point that no legitimately unknown contingencies exist.

As for the second factor under *Winter,* all parties in this case will suffer hardship if determination of the constitutionality of HVIRA is further delayed. Plaintiffs, in particular, know with absolute certainty that, if HVIRA takes effect, suspension of their licenses to do business as insurance companies in California will follow forthwith. Waiting for this harm to be suffered, not only by the companies themselves, but by all the citizens of California who are their customers and employees, serves no one. The court therefore concludes that the case is ripe for, and justice is best served by, a present determination of whether HVIRA survives a procedural due process challenge.

### c. *Procedural due process's meaningful hearing requirement*

The court therefore turns to the question of whether HVIRA's procedures provide due process. "A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Burson,* 402 U.S. at 540, 91 S.Ct. 1586. The procedural safeguards sufficient to protect one's interest in welfare benefits, for example, may not suffice when one faces a felony charge. *Compare Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), *with Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). There are, however, certain longstanding bare minimum components to the right to procedural due process.

■ The opportunity to be heard "at a meaningful time and in a meaningful manner" is the fundamental requirement of procedural due process. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citing *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187 (1965)). For over one hundred years, our courts have held that due process of law requires "specific charges, due notice of such charges, an opportunity to make specific answers to them, an opportunity to cross-examine the witnesses in support of them, an opportunity to adduce testimony in contradiction of them, and an opportunity for argument upon the testimony and upon the law and facts." *United States ex rel. Wedderburn v. Bliss,* 12 App. D.C. 485, 493 (1898). Thus, in order to satisfy due process' "meaningful hearing" requirement, the inquiry that is made must involve at least some assessment of fault or

liability. *See Burson,* 402 U.S. at 539, 91 S.Ct. 1586.

■ On its face, HVIRA makes no provision for any hearing whatsoever. Defendant argues that the statute's facial lack of a hearing provision does not render it unconstitutional because the right to a hearing must be "implied into" the statute itself in the absence of language to the contrary. *See Fascination Inc. v. Hoover,* 39 Cal.2d 260, 246 P.2d 656 (1952).[6] The hearing that will be provided under HVIRA, to the extent that HVIRA contemplates a hearing at all, however, is not a meaningful hearing for the purposes of surviving a due process challenge. Defendant's position, supported by the plain language of the statute, is that an insurer's failure to produce documents, for any reason other than the fact that no documents exist, will trigger an immediate license suspension action. According to defendant, that action will take the form of a hearing before an administrative law judge. Leslie Tick's testimony and the statute itself make it clear that the administrative law judge is not permitted to exercise any discretion as to whether noncompliance might be excused or justified, or mitigated in any way that could affect the outcome of the hearing.

Thus, as both this court and the defendant interpret the statute, the same sole fact that triggers the suspension hearing will dictate its outcome. That cannot possibly amount to a meaningful hearing. Such a "hearing" is particularly meaningless where, as here, the same individual who decides to trigger the hearing makes the final determination of whether to suspend the license.[7] Under HVIRA, failure to produce the demanded records for any reason at all, even impossibility, effectively results in automatic license suspension. This is the deprivation of a protected property interest without due process of law.

Defendant contends that there are disputed issues as to whether plaintiffs, as they have asserted, actually lack the corporate authority to compel production of the demanded documents from their affiliates. Other than raising evidentiary objections to plaintiffs' declarations and making legal arguments about the meaning of the word "control," defendant has not presented any substantial evidence to create a triable issue of fact on the question of corporate control. Defendant also disputes, and asks this court to determine as a matter of law, whether foreign criminal and civil laws prohibit production of the information required by HVIRA.[8] On a

---

6. Defendant, having thus apparently conceded that plaintiffs would be entitled to a hearing, (indeed, having argued that a hearing is so obviously necessary as to be implied), later cites *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), for the proposition that "a hearing need not be provided when there are no factual issues in dispute." In other words, a hearing would be required in theory, but would not be required in application, because, here, there would be no facts to resolve. A statute that sustains such contrary reasoning in its defense, because it facially obviates any practical need for the impliedly-necessary and constitutionally-required hearing, must be a violation of due process.

7. Section 790.15 specifies that an action to suspend a certificate of authority under this

section shall be conducted in accordance with the Administrative Procedure Act. That Act directs that the "agency" itself, in this case, the Commissioner, render the final decision. Cal. Govt.Code § 11517.

8. Though the court declines to reach a conclusion of law as to whether German and/or Swiss laws prohibit plaintiffs' European affiliates from complying with HVIRA, the court notes that, other than making evidentiary objections, defendant has not presented evidence to refute the submitted position of the Swiss government as to the impact of Article 273 of the Swiss Penal Code. Moreover, if it were to reach the issue, this court would owe "substantial deference" to a foreign nation's interpretation of its own laws. *See In Re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1312 (7th Cir.1992).

procedural due process analysis, however, the question of whether plaintiffs could ultimately prove that it is impossible for them to comply with HVIRA does not control.[9] The fact that the statute *denies them the opportunity to be heard on that point,* or, for that matter, on any point, is what controls.

 d. *Whether the state's "licensure power" somehow obviates plaintiffs' entitlement to a meaningful hearing under procedural due process*

 Defendant argues that "California can rationally condition the privilege of doing business in the State" on strict compliance with HVIRA's disclosure requirements. Defendant persists in the position that the first, last, and only constitutional question in this case is the rational basis test. There are, however, other limitations on a state's power. The state cannot, for example, impose conditions on doing business in California which require relinquishment of constitutional rights. *See generally* Laurence H. Tribe, *American Constitutional Law* § 11.5 at 781 (2d ed. 1988) ("Independently unconstitutional conditions—those that make enjoyment of a benefit contingent on sacrifice of an independent constitutional right—are invalid."). *See also Barron v. Burnside,* 121 U.S. 186, 200, 7 S.Ct. 931, 30 L.Ed. 915 (1887)("In all the cases in which this court has considered the subject of the granting by a state to a foreign corporation of its consent to do business in the state, it has uniformly asserted that no conditions can

be imposed by the state which are repugnant to the Constitution."); *Terral v. Burke Constr. Co.,* 257 U.S. 529, 532–533, 42 S.Ct. 188, 66 L.Ed. 352 (1922)("[T]he sovereign power of a State in excluding foreign corporations, as in the exercise of all others of its sovereign powers, is subject to the limitations of the supreme fundamental law."); *and Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)(simply denominating governmental interest as "business regulation" does not immunize it from constitutional challenge).

 At oral argument and in its papers, defendant specifically referred to California's Insurance Holding Company System Regulatory Act, ("IHCSRA"), arguing that it establishes that California has an existing, presumably constitutionally permissible, public policy of requiring insurance companies to report information pertaining to their foreign affiliates. Several ways in which this regulatory statute is distinguishable from HVIRA bear mention. First, it seeks significantly narrower information, related only to the affiliates' financial viability. Second, it specifically provides that the disclosed information shall be treated as confidential and shall not be made public by the Commissioner. Third, and most notably, it provides a forum within which insurers can present factual defenses to a failure to disclose "allegation" against them, and specifically dictates that an insurer will be given "notice and an opportunity to be heard" before the Commissioner acts to suspend, revoke, or re-

---

**9.** Plaintiff has submitted evidence which tends to show, at the least, that their affiliates believe compliance is unlawful and are refusing to provide the demanded documents. Recognition of impossibility as an excuse for non-performance is a long-standing tenet of our justice system. There are numerous cases which stand for the proposition that a sanction imposed for failing to produce infor-

mation due to inability violates our notions of fundamental fairness and due process. *See e.g., Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *and In re United States v. Sumitomo Marine & Fire Ins. Co.,* 617 F.2d 1365, 1369 (9th Cir.1980).

fuse to renew a license for non-compliance with the disclosure requirements. *See* California Insurance Code § 1215 *et seq.* In short, IHCSRA is in many ways exactly what HVIRA is not. Its existence in no way establishes that HVIRA is constitutional, and it certainly does not support defendant's implied argument that the state's "licensure" power somehow trumps the requirements of procedural due process.

### e. *Conclusion*

By providing that no state shall "deprive any person of life, liberty, or property without due process of law," the Fourteenth Amendment of our Constitution binds the fundamental protections of life, liberty, and property together into one concept. We need look no further than the factual background of this case to understand why these three protections are so joined.

Ever since the Fourteenth Amendment was enacted in 1866, courts have struggled to define precisely what it means to protect our property interests with "due process." One tenet of this area of jurisprudence is clear, however: a state may not "make any thing due process of law" by merely declaring it to be so. *Davidson v. New Orleans,* 96 U.S. 97, 102, 24 L.Ed. 616 (1877). The power of a state is not unchecked, and it is not absolute. Neither does it become so, as the Commissioner has argued here, under the cloak of some "licensure" power. It does not even become so if the power is wielded out of the purest intention to somehow right one of humanity's wrongs, or to facilitate some amount of redress for the victimized.

By mandating license suspension for non-performance of what may be impossible tasks without allowing for a meaningful hearing, HVIRA deprives plaintiffs of a protected property interest without affording them due process of law. Plaintiffs' joint motion for summary judgment that the HVIRA is unconstitutional under the Due Process Clause must therefore be granted.

### IV. *Other Grounds for Summary Judgment*

Plaintiffs have also argued that the statute is unconstitutional for various other reasons, including that it is unconstitutionally vague. Because the court finds that the statute violates the Due Process Clause, and because, following the guidance of the Ninth Circuit's remand, the parties have focused their development of the factual record on due process issues, the court does not reach the other constitutional challenges raised by plaintiffs.

Also, defendant moves for summary judgment on the ground that HVIRA is not constitutional for any other reason raised in any plaintiffs' complaint.[10] Because the court finds that the statute is unconstitutional on due process grounds, the court need not render advisory opinions on defendant's arguments that the statute passes other constitutional tests. Defendant's motion for summary judgment will therefore be denied on the ground that the statute violates due process.

IT IS THEREFORE ORDERED that plaintiffs' motions for summary judgment upon the ground that HVIRA violates due process be, and the same hereby are, GRANTED. Defendant is hereby permanently enjoined from suspending the licenses of the plaintiffs to do business in California based on their failure to comply with the Holocaust Victim Insurance Relief Act and its accompanying regulations.

---

**10.** Defendant's original moving papers addressed all of plaintiffs' constitutional challenges except the due process argument raised by the Generali plaintiffs concerning the Commissioner's allegedly unconstitutional "campaign" against Generali.

IT IS FURTHER ORDERED that defendant's motion for summary judgment upon the ground that HVIRA is not unconstitutional be, and the same hereby is, DENIED.